IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs November 26, 2002

## STATE OF TENNESSEE v. JAMIE H. JONES[1]

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2000-A-178     Steve R. Dozier, Judge**

---

**No. M2002-00055-CCA-R3-CD - Filed June 4, 2003**

---

The appellant, Jamie H. Jones, was convicted by a jury in the Davidson County Criminal Court of five counts of forgery and received a total effective sentence of eight years incarceration in the Tennessee Department of Correction.  On appeal, the appellant raises several issues for our review, including the sufficiency of the evidence, the correctness of the trial court's rulings, the propriety of the sentences imposed, and the denial of the appellant's motion for new trial.  Upon review of the record and the parties' briefs, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court are Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which DAVID G. HAYES and JERRY L. SMITH, JJ., joined.

Michael A. Colavecchio (on appeal) and Paul T. Housch (at trial), Nashville, Tennessee, for the appellant, Jamie H. Jones.

Paul G. Summers, Attorney General and Reporter; Mark A. Fulks, Assistant Attorney General; Victor S. (Torry) Johnson, III, District Attorney General; and Brian K. Holmgren and Kristen K. Shea, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

### I.  Factual Background
A. Trial

The appellant was indicted by the Davidson County Grand Jury on the following counts due to the writing of falsified checks:

---

[1] The indictment in the instant case originally identified the appellant as "Jamie H. Waldrum, a.k.a. Jamie H. Jones."  However, prior to trial, the appellant and the State agreed to orally amend the indictment to reflect that the appellant's name is Jamie H. Jones.

| Count | Date of Offense | Name of Offense | Amount of Offense |
| --- | --- | --- | --- |
| One | 12-31-99 to 1-10-00 | Theft | $60,000 or more |
| Two | 11-8-99 | Forgery (check #2611) | more than $1,000, less than $10,000 |
| Three | 11-22-99 | Forgery (check #2612) | more than $1,000, less than $10,000 |
| Four | 11-30-99 | Forgery (check #2613) | more than $1,000, less than $10,000 |
| Five | 12-6-99 | Forgery (check #2716) | more than $1,000, less than $10,000 |
| Six | 12-14-99 | Forgery (check #2715) | more than $1,000, less than $10,000 |

Prior to trial, the appellant moved the trial court to dismiss count one, alleging that none of the falsified checks underlying that count were written in the time frame alleged by the State. In response, the State asserted that the indictment contained a typographical error and explained that count one of the indictment actually encompassed the appellant's activities from December 31, 1998, to January 10, 2000. The State further asserted that the appellant had actual notice of the dates of the checks underlying count one. The State then moved the trial to court amend the indictment to correct the typographical error, maintaining that "[h]ad I anticipated that we could be back here today arguing this . . . we could have gone back arguably to the Grand Jury and moved to amend that particular count." The appellant agreed that she had actual notice regarding the checks set forth in count one and admitted that amending the indictment would cure any potential double jeopardy problem. The trial court granted the State's motion to amend count one to include the period of December 31, 1998, through January 10, 2000, and thus denied the appellant's motion to dismiss count one of the indictment.

At trial, the State's first witness was James L. Parris (Larry).[2] Larry testified that he began Parris Printing with his son, James Ritchie Parris (Ritchie) in 1992. Soon, Donnie Lackey became a partner in the business. Parris Printing was successful and, three years prior to trial, had forty or forty-five employees. At the time of trial, Larry owned 12½ percent of the business, Ritchie owned 72½ percent, and Lackey owned 15 percent. Larry asserted that Ritchie "was in charge, running everything."

Larry explained that Ardth Moseley was the secretary for Parris Printing and Ken Kraft was the company's accountant. When the business reached a certain level of size and success,

_____

[2] In this opinion, we will utilize the first names of Larry and Ritchie Parris because they both possess the same last name. We mean no disrespect by addressing the witnesses in this fashion.

Kraft recommended that Parris Printing employ the appellant as a full-time bookkeeper. Larry stated that the business began to lose money after the appellant was hired, but became financially successful after the appellant left the company.

Larry maintained that only Ritchie and Lackey had authority to sign checks relating to the business; no employee had the authority to sign checks. Larry admitted that he had never seen the appellant sign Ritchie's name to a check; additionally, Larry acknowledged that the checks underlying the indictment were signed "James R. Parris," which was Ritchie's customary signature on the company's checks. However, Larry maintained that Ritchie did not sign the checks in question.

After the conclusion of Larry's testimony, the appellant asked for "the Rule," specifically requesting that Larry be excluded from the courtroom during the testimony of other witnesses. The appellant explained that she might want to recall Larry to testify after the State presented the testimony of Ritchie and Lackey. The trial court ruled that the possibility of recalling Larry was insufficient reason to exclude him from the courtroom and permitted the State to continue with its proof.

Donnie Lee Lackey testified that he was the "Vice-President, Production Supervisor" for Parris Printing. Lackey stated that even though Ritchie owned the largest percentage of the business, the partnership agreement provided that the three partners were required to agree on decisions concerning the company. Additionally, Lackey stated that he typically earned $94,000 per year at Parris Printing and further asserted that the largest yearly salary he had received was $110,000.

Lackey estimated that at one point the business employed fifty people. However, due to financial difficulties, Parris Printing laid off approximately seventeen employees. The employees were laid off in an attempt to cut operating expenses. The reduction in staff helped the company financially for a month or two, but then Parris Printing began having financial difficulties once more. In fact, the business was forced to take money out of its savings account in order to cover the payroll expenses, something the company had never had to do.

Lackey identified the appellant as the former bookkeeper for Parris Printing. He explained that Ritchie was in charge of hiring employees for the office and, Ritchie had hired the appellant. Lackey observed that at the time of trial the business was "back on track" and noted that the financial difficulties coincided with the appellant's term of employment at Parris Printing. Specifically, Lackey maintained that no such difficulties had occurred before or since the appellant's employment. Lackey stated that while he would know if Ritchie had hired anyone as an independent contractor, the terms of that contract would be within Ritchie's control. Lackey acknowledged that he had no direct knowledge of the appellant working with Parris Printing as an independent contractor. Further, he did not recall the appellant's employment being terminated prior to the discovery of the questioned checks. However, he did recall that the appellant had difficulty working full-time. The appellant was fired after the discovery of the purportedly fraudulent checks.

At the time of the offenses, only Lackey and Ritchie had the authority to sign the checks for Parris Printing. Neither Lackey nor Ritchie had authorized anyone else to sign the business checks. Lackey stated that he signed the payroll checks which were generated by the Paychex system, and Ritchie signed the checks to pay the vendors. The vendor checks were generated by a computer program in the office of Parris Printing. Lackey inspected several of the appellant's legitimate payroll checks and noted that the largest amount the appellant had been paid for one week's work was $656.00.

Lackey examined the checks underlying the indictment and noted that the checks were made payable to "Jamie Jones," the appellant. Furthermore, Lackey asserted that he was very familiar with Ritchie's signature. Upon further examination of the checks, Lackey stated that the signatures on those checks were not Ritchie's. He explained that copies of the checks underlying the indictment had been discovered at the office of Parris Printing. Although these copies bore the same check numbers as the questioned checks, the copies were marked payable to several vendors who did business with Parris Printing. Lackey stated that Parris Printing had a pending civil lawsuit against the appellant.

James Ritchie Parris (Ritchie) testified that he was the president of Parris Printing and that he owned the business in partnership with his father and Lackey. Ritchie was responsible for paying the weekly bills, borrowing money, and overseeing the front office. Ritchie testified that he typically earned $104,000 per year from Parris Printing and the most he had ever earned from the business in one year was $160,000. At the time of trial Parris Printing had thirty-five employees; at the beginning of 1998, Parris Printing employed forty-five or fifty people.

At the time of trial, Ritchie's cousin, Vickie Gamble, was the part-time bookkeeper for Parris Printing. She was paid $17 or $18 hourly. Gamble's friend was the certified public accountant (CPA) for the business. However, prior to Gamble's employment, Parris Printing had always utilized Ken Kraft as its CPA. Additionally, Ritchie noted that Ardth Moseley, the secretary, performed some of the bookkeeping functions for the business. Moseley earned $45,000 per year and had been with the company for several years.

In August 1998, prior to Gamble's employment with the company, Ritchie acted on Kraft's recommendation and hired the appellant as the full-time bookkeeper for Parris Printing. One of the reasons Ritchie hired the appellant was because she was already familiar with Real World Accounting (Real World) software, a program that had recently been installed at Parris Printing. The appellant was hired as a full-time employee, and was expected to work forty hours per week. Furthermore, the appellant was to be paid an annual salary of around $40,000 per year. At that time, Paychex managed the payroll system for Parris Printing and the appellant received weekly checks from Paychex. The agreement between the appellant and Parris Printing was in place from August 11, 1998, until December 15, 1998. Although Moseley and the appellant had the authority to prepare the checks, Ritchie maintained that only he and Lackey had the authority to sign the business checks.

Ritchie testified that the appellant "had problems working a forty-hour week." Accordingly, Ritchie allowed the appellant to be paid for the hours reflected on her time card. However, in December 1998, the appellant went on vacation and did not return to work. Ritchie talked with the appellant about her inability to work full-time and explained that he could not pay her salary if she did not work the required hours. The appellant suggested that she work for Parris Printing part-time as an independent contractor through her company, Data Solutions. The appellant was to be paid $20 an hour for the time she worked in the office of Parris Printing and $15 an hour for the time she worked at home. Parris Printing was to be billed for the money owed. The appellant would then be paid through Parris Printing's in-house accounting system the same way other vendors were paid. Ritchie asserted that the appellant's employment was never officially terminated; she simply ceased to be a full-time employee and began to work as an independent contractor. Specifically, Ritchie testified that the appellant was never issued a "dismissal sheet."

Ritchie stated that the appellant never worked forty hours a week as an independent contractor and insisted that he would never agreed to pay the "outrageous amount" of $120 an hour for the appellant's services. Furthermore, he noted that the appellant did not start billing Parris Printing as Data Solutions until March 1999; prior to that time, the appellant invoiced the company as "Jamie Jones." Additionally, Ritchie noted that while the appellant worked as an independent contractor, Moseley performed some of the bookkeeping functions in order to learn how to use the Real World software.

In 1999, Parris Printing began experiencing financial difficulties for the first time since the inception of the business. In order to cut operating expenses, the business was forced to lay off fourteen or fifteen employees in July 1999. However, the business later improved and some of the vacated positions were filled. The appellant was not laid off because the business needed a bookkeeper. The reduced expenses helped the business short term, but Parris Printing began experiencing additional problems in November 1999. Specifically, some of the payroll checks were not honored by the bank due to insufficient funds. Because of this problem, Ritchie and the appellant began examining the business's finances.

Initially, the appellant contended that the financial problems were caused by problems with the company's "sweep account" at the Bank of America. Kraft assured Ritchie that the company was solvent and began examining Parris Printing's accounts. Reassured by Kraft, Ritchie left for vacation in Florida on November 18, 1999. Ritchie was in the Bahamas on November 22, 1999.

Ritchie explained the company's billing system. He stated that when invoices were received at the company, Moseley entered the bill into the computer system. Based upon these entries, either the appellant or Moseley generated an "Items Aged Open Report" which reflected outstanding invoices and the date of the invoice. Each week, Ritchie examined the report and determined which bills were to be paid that week. Ritchie asserted that he never made only a partial payment on a bill and always paid an invoice in full. He also explained that he typically did not pay a bill for a paper company unless it was sixty days old but paid all other bills after forty-five days.

On January 11, 2000, while the appellant was out of the office, he examined the report and noticed that there was a bill from Athens Paper Company that was over 200 days old. Ritchie recalled that the bill had not been on the report he reviewed the previous week. Accordingly, Ritchie requested that Moseley provide the hard copy of the Athens Paper Company invoice. Moseley was unable to do so because the invoice did not exist.

Next, Moseley examined the check register and discovered four other checks that also did not have accompanying invoices. The records at Parris Printing reflected the following:

| Check Number | Payable To | Amount of Check |
|---|---|---|
| 2611 | Advanced Mail Concepts | $6,841.81 |
| 2612 | Athens Paper Company | $8,387.70 |
| 2613 | MKD, International | $9,676.42 |
| 2715 | Bowers Ink Company | $7,376.49 |
| 2716 | MKD, International | $9,280.74 |

Moseley called the Bank of America and requested that the bank send Parris Printing copies of the cancelled checks relating to the five questionable entries. [3]

When the appellant returned to work on January 13, 2000, Ritchie asked her to "find out what is going on." He "mentioned to her that there was–there was some checks mentioned and it totaled about forty-two thousand dollars, that we couldn't find." However, Ritchie did not inform the appellant regarding the questioned check numbers or "the accounts that [the checks] were supposedly paid to."

Ten or fifteen minutes later, the appellant came into Ritchie's office, handed him a letter and a personal check for $42,000, and left. The letter, which was signed by the appellant and was addressed to Ritchie, stated:

> I am writing this because I am afraid to talk to you. You see, I wrote those checks you can not explain to myself. I had thoroughly intended for those funds to be back in the bank before the end of the year but the arrangements have been delayed and I am under the impression at this point that they will be available no later than 1/28/00. I have enclosed a check for $42,000.00 to cover the amount of the checks of $41,563.16 and a little extra incase [sic] I have caused problems at your bank. I don't know how to explain this to you other than I have had some horrendous legal expenses with [my husband] Lloyd's X-wife [sic] suing him for more support and many other things, as well as I am currently in a law suit with my previous

---

[3] These five checks underlie the appellant's convictions for counts two through six.

employer for sexual harassment. I am extremely sorry I was not honest with you but I did this as a last resort. I hope you will find it in your heart to forgive me for the wrong I have done. I have spent lots of time praying to figure out what to do. When I entered them in the computer it was a mistake and I am no good at hiding my mistakes. I almost knew it would not work but I had to show something for those checks for Ken Kraft.

Due to the dishonesty in my position, I am resigning today. I hope you will understand I never meant any harm and I do admit what I did was wrong!!!! If you or Ardth need to call me for any reason, I will be glad to help with any answers or consulting that you need.

On the appellant's personal check, she noted that the $42,000 payment to Parris Printing was for "ck #2611, 2612, 2613, 2715, 2716." Ritchie told the appellant that he would need a cashier's check for the $42,000, but the appellant never provided one. He denied that he fired the appellant after discovering the fraudulent checks; instead, Ritchie maintained that the appellant voluntarily resigned.

Ritchie testified that Moseley contacted the bank to see if Parris Printing could cash the appellant's check. However, the bank reported that the appellant's account did not have sufficient funds to cover the check. Accordingly, Parris Printing never received the $42,000 payment.

Ritchie explained that the checks written in-house had three layers: the top, white layer; the middle, pink layer; and the bottom, yellow layer. The pink and yellow layers were supposed to be carbon copies of the information contained on the white layer. The pink copies of the five checks, as mentioned *supra*, indicated that the five questioned checks were paid to legitimate vendors.[4] However, when the bank provided the copies of the cancelled checks, Ritchie observed that the questioned checks were in fact written to the appellant. Ritchie denied signing any of the five checks. Regardless, Ritchie testified that he never witnessed anyone sign his name to those checks.

After the appellant's deception was revealed, Ritchie and Moseley began a more extensive search of Parris Printing's bank records and they discovered that the appellant had written approximately fifty other checks payable to herself.[5] Once again, the pink copies of the checks reflected that they had been issued to legitimate vendors when in fact the appellant was the recipient of the payments. Ritchie denied that any of the fifty checks had been presented to him for his authorization and further denied signing those checks.

---

[4] No further mention was made at trial concerning the yellow copy of the checks.

[5] These checks underlie count one of the indictment.

Ritchie testified that he had to rely on the copies of the cancelled checks which were provided by the bank because the original copies, which would have been sent to Parris Printing in the bank statements, could not be found. Ritchie further testified that the appellant received the bank statements for Parris Printing.

Ritchie examined the checks underlying counts one through six and asserted that although the checks bore the signature "James R. Parris," he was not the person who signed the checks. Particularly, Ritchie observed that the "descenders on these 'J's' cut back to the right, and I believe, if you'll notice my signatures, I don't think you–there's ever a case where my J's have cut back to the right on the descenders." Additionally, Ritchie noted that check number 2613, which was the basis of count three, was purportedly written on November 22, 1998, while Ritchie was in the Bahamas on vacation. Ritchie denied pre-signing any checks prior to his vacation. Ritchie conceded that the bank never refused to honor one of the disputed checks due to suspected forgery.

Ritchie also examined a document purporting to be an invoice dated on December 7, 1998, from the appellant's company, Data Solutions, to Parris Printing. The invoice stated that the appellant was to be paid $20,000. The invoice stated that the payment was

> Incentive To Return After Being Fired By RP-AM can not do a lot on accounting system. . . . Agreement to return 12/7/98 provided Incentive Bonus was obtainable. New hourly rate of 120.00 per hour with a minimum of 40 hours per week plus expenses. Invoices for this to be given only to RP due to employees not needing to know arrangements.

Ritchie insisted that he had never seen this invoice and vehemently denied entering into such an agreement with the appellant. In fact, Ritchie asserted that he would not have laid off fourteen or fifteen employees in order to have sufficient funds to pay the appellant and contended that the appellant had no unique skills that would justify her being paid a salary that was approximately three times the salary earned by the owners of the company.

Finally, Ritchie acknowledged that Parris Printing had filed a civil lawsuit against the appellant. The company placed a lien on the appellant's assets, namely her home, to prevent her from transferring her assets. Ritchie was hopeful that the proceeds from the civil litigation would help the company recoup their losses.

Rick Cate, a collections officer with Wilson Bank and Trust in Lebanon, testified that he had printed a list of the appellant's accounts. The appellant and her husband had two accounts. The appellant had also opened an account in her son's name, and the appellant had an account for Data Solutions. Both of the accounts in the names of the appellant and her husband were closed by June 28, 2000. Additionally, the Data Solutions account was closed July 17, 2000. The checks issued from those accounts totaled over $300,000.

Amy Holman, a sales support associate with the Bank of America in Nashville, testified that she was the assistant of Doswell Brown and that Parris Printing was one of their clients.

In 1999, Ritchie and the appellant came into the bank because the company's accounts would not balance. The appellant never indicated that "she knew where money was going in the accounts for Parris Printing." At the meeting, after reviewing the list of checks which was generated by the bank's computer, Holman could find no discrepancies, but she noted that the accounts would not balance. Later, Ritchie requested that Holman obtain copies of certain checks issued by Parris Printing. Holman noted that no checks were ever "dishonored" by the Bank of America because of suspected forgery.

Ardth Moseley testified that she was the office manager for Parris Printing and had worked for the company since January 4, 1994. She stated that the appellant began working at Parris Printing in August 1998 and she worked in the front office with Moseley. After the appellant began working at Parris Printing, she repeatedly instructed Moseley not to open the bank statements. Moseley testified, "I was told, right up front, that there was no need for me to do that any longer, that there was absolutely no need for me to ever open a bank statement."

Moseley observed that the appellant was unable to work the hours that she was supposed to work and Ritchie maintained that he could not justify paying the appellant's salary if she was unable to work forty hours per week. Accordingly, Ritchie "put her on a time clock, had her punch in and out on a time card." Yet, the appellant continued to work less than forty hours per week. Thus, Ritchie resorted to hiring the appellant as an independent contractor. Moseley stated that the appellant had not been fired prior to the time she began working as an independent contractor.

Mosley testified that the appellant submitted invoices to Parris Printing via Data Solutions. The appellant was paid $20 an hour for the time she worked at Parris Printing and $15 an hour for the time she worked at home. The appellant submitted her invoices directly to Ritchie. After Ritchie approved the invoice, he gave it to Moseley to enter into the computer like any other bill from a vendor. Moseley recorded the invoices on the Real World program and subsequently the appellant issued her own check after Ritchie approved payment of the invoice. Moseley testified that Ritchie approved payment of certain bills after reviewing the weekly report and that he always paid the full amount of any given invoice. Once the check was printed, it was submitted to Ritchie for his signature because neither Moseley nor the appellant had the authority to sign the business checks. Moseley asserted that the appellant never received a paycheck for over $5,000. Moseley further noted that the appellant never worked forty hours a week during her employment as an independent contractor.

On July 27, 1999, Parris Printing was required to lay off approximately fifteen employees due to financial difficulties. Nevertheless, in November 1999, the company again had financial troubles in the form of paychecks "bounc[ing]."

In January 2000, Ritchie asked Moseley to locate hard copies of the invoices relating to certain checks because he had discovered an invoice that was over 200 days old on the weekly "aging report." Moseley was unable to find corresponding invoices. Shortly thereafter, on the

appellant's last day of work, the appellant attempted to hide something that she was writing on her computer from Moseley. A few minutes later, Moseley saw the appellant in a brief meeting with Ritchie. Ritchie showed Moseley the letter that the appellant had given him which detailed the appellant's role in the company's financial problems. Moseley maintained that she had never provided the appellant the numbers identifying the suspicious checks nor did she inform the appellant of the amount of the checks.

Moseley stated that she had worked with Ritchie for several years and had seen his signature "hundreds" of times. Upon examining the checks underlying counts one through six, Moseley said that the signature on the checks was not Ritchie's signature.

Moseley observed that the appellant always dressed very nicely for work, noting that she wore designer clothes and "lots" of jewelry. The appellant informed Moseley that she had purchased a hot tub, had an in-ground pool installed, had landscaping and concrete work done, and had special gates installed at her home. The appellant also went on several trips to New York, Florida, and New Orleans. Additionally, Moseley noticed that the appellant bought a white Lincoln Town Car that appeared new. Soon thereafter, the appellant arrived at work in a Lincoln Navigator and explained that her fifteen-year-old son had wrecked the Town Car. On another occasion, the appellant drove a dark sports car to work, explaining that she had bought it for her son. When Moseley asked the appellant how she could afford all of her purchases, the appellant stated, "You just have to know how to manage your money, Ardth."

Kenneth Randall Kraft, a CPA with Kraft and Company, testified that Parris Printing was his former client. He became acquainted with the appellant while she was working with the Vermeer Corporation. After the appellant left Vermeer, Kraft suggested that Ritchie hire her as the in-house bookkeeper for Parris Printing. Kraft based his recommendation in part upon the appellant's familiarity with Real World. Kraft further opined that the appropriate salary for the type of bookkeeper Parris Printing required was between $30,000 and $40,000. Kraft noted that paying a bookkeeper over $300,000 would not be financially sound.

Prior to the appellant's employment, Parris Printing had no difficulty paying their debts. Previously, Kraft had received and reviewed the company's bank statements for reconcilement each month. After the appellant was employed, Kraft no longer received the bank statements on a monthly basis. In fact, the appellant did not provide any of the bank statements for 1999 until September or October of that year.

In November or December 1999, Kraft met with Ritchie and the appellant to attempt to reconcile the company's bank statements. The appellant never suggested that she knew the source of the company's financial problem. Kraft testified that he had prepared the 1999 income tax return for Parris Printing. The return reflected that the company had a profit in excess of $187,000. However, if more than $300,000 had not been taken from the company that year, the profit margin would have been approximately half a million dollars.

Detective Brian Edward Celatka, a detective in the fraud unit of the Metropolitan Police Department, served an arrest warrant on the appellant at her home. Detective Celatka testified that although the outside of the home depicted "a white brick house, . . . just average," the inside of the home was "very well-decorated." The furniture was "very nice" and the appellant had two large-screen televisions. Detective Celatka observed that the backyard of the house was landscaped and was "pretty much all concreted, and it was fenced in, and it had an in-ground swimming pool." The backyard was surrounded by a "very nice metal type" fence with a coded gate. He and the appellant left the home through the garage where Detective Celatka noticed a Lincoln Navigator. He stated that the appellant was cooperative during the arrest.

Ray Edward Smith testified on behalf of the appellant. Smith sold Real World software and became acquainted with the appellant when she worked for Vermeer. He sold the Real World software to Parris Printing and installed it on the company's computers after the appellant began working there. Smith noted that "Real World needs a little bit of training up front," but explained that someone could be trained to use the software within a couple of weeks. Smith did not know of anyone who was being paid a salary of $300,000 to operate the Real World software.

Thomas Walter Vastrick testified for the appellant as an expert forensic document examiner. Vastrick explained that he had received the checks underlying the indictment and had been provided copies of Ritchie's authentic signature. Additionally, in order to do a handwriting comparison, Vastrick was provided copies of checks that the appellant had written. Vastrick testified that, while the signatures "pictorially" resembled Ritchie's signature, it became "very, very obvious to me that there had been an attempt to copy the signatures." Vastrick noted that one of the characteristics which indicated that the signature was not genuine was "the manner in which the descenders on the 'J's'–the way in which they went." Vastrick observed that an attempt to copy a signature "raises some problems in comparisons with other people because, when you have a case of an attempt to copy, a lot of times there are very few, if any, characteristics of the actual writer." Accordingly, Vastrick opined that the signatures on the questioned checks were not written by Ritchie, but Vastrick could not determine if the appellant had written the checks. In sum, Vastrick testified that "I can't say she did write it; I cannot say she didn't."

The appellant testified on her own behalf. She stated that she was forty-four years old and that she had been married to Lloyd Jones for slightly more than two years. She stated that she had a seventeen-year-old son, Barry, Jr. (BJ), who was born during a previous marriage. The appellant asserted that she started Data Solutions in 1992. She noted that she was familiar with Real World software in 1998 because she had worked with the program while employed at Vermeer.

Through her work at Vermeer, the appellant became acquainted with Kraft. When the appellant "had finished up with pretty much all I could do for [Vermeer]," she approached Kraft and inquired about employment at other companies. Subsequently, Kraft recommended the appellant for the position of "[i]n-house accountant" at Parris Printing. She stated that she was hired as a full-time employee in 1998 to replace Mosley, and was to be paid a salary of $42,000 per year. Shortly

after she began working at Parris Printing, the appellant contacted Smith and had Real World software installed at the company.

The appellant asserted that, in December 1998, she began missing work frequently because her son became ill and she had to take him to the doctor. Ritchie informed the appellant that he could not pay her salary if she did not work the required forty hours per week. During the first or second week of December 1998, Ritchie terminated the appellant's employment. The appellant left Parris Printing but later called Moseley "because there were some things that . . . needed to be finished up." Moseley was concerned because she did not know how to run the Real World software and stated that she would speak with Ritchie on the appellant's behalf. The appellant recalled that on the following Thursday or Friday, Ritchie called her at home and asked her to return to work. The appellant told Ritchie that she would consider his request. Ritchie told the appellant to "make me an offer."

The appellant testified that she called Ritchie the next day and informed him that she would require "a twenty-thousand-dollar incentive to come back." The appellant opined that Ritchie agreed to pay the amount because "he felt sorta stranded and needed to." Because of her concerns regarding Ritchie's "hire and fire abilities," the appellant advised him that she would return to work only as an independent contractor through her company Data Solutions. The appellant also requested payment of $120 per hour, with a minimum of forty hours per week, plus expenses. She defended the amount, asserting that "[t]here are accountants out there that make that and more." The appellant maintained that this agreement was reflected in the December 7, 1998, invoice. The appellant testified that Ritchie instructed her to submit all of her invoices directly to him because he did not want anyone to know the amount she was being paid.

The appellant stated that during some weeks she worked twenty hours and some weeks she worked sixty or seventy hours. The appellant explained, "I was to prepare two, different invoices, one for twenty dollars an hour, one for a hundred-and-twenty dollars an hour. The invoice for twenty dollars an hour was the one that [Ritchie] gave to [Moseley] to run through accounts payable to cut me a check." Based upon the two invoices, the appellant received two paychecks. The first check, which was generated by Moseley, was for $400 reflecting payment of $20 per hour. The second check, reflecting payment of $120 per hour, was for the amount of $4,800. The appellant testified regarding the payments, specifically explaining:

> I would – first of all the – the four-hundred-dollar ones were pretty easy. I just gave those to Ritchie, and he gave them to Ardth; and she put them in the payables, and then I would cut the check for that, when they were in the payables.
>
> The other ones were a little different. I gave those to Ritchie, and he would bring it – you know – tell me yes or no or – you know – we would discuss something over.

And nobody knew about those checks but him and I; so, those checks had to be cut when I ran the payables, but they would be run after the payables. In other words, it was a – it was an end-of-the-run check.

And, when you run the checks up – after you get through processing a run of checks and you feed it up, you've burned two or three checks at the end of it.

And those checks were saved for putting in – the way that – the way that he wanted it done was, he wanted the invoices that the CPA would see and his partners would see and Ardth would see to show a vendor, instead of me, because he didn't want any flags going up that he was paying me forty-eight-hundred dollars a week.
. . . .
I would take off the white copy, and I would run it through the computer to myself. And . . . on this particular program, it say, "Are all the checks that printed okay?"

Well, on this software you can tell it no and it will void that check; but you can go back in and print another check, the same number. And that's how the pink and yellow copies were run.

The appellant testified that she watched Ritchie sign several of the checks that she printed for herself. She then took the checks and deposited them in her account at Wilson Bank and Trust. The appellant removed the original copies of the checks from the bank statements at Ritchie's direction. She gave the originals to Ritchie, but she did not know what he did with them. Additionally, the appellant claimed that before Ritchie left for vacation, he pre-signed the check that was purportedly written on November 22, 1998. She asserted that she did not steal money from Parris Printing and did not forge Ritchie's name to the checks. She stated that the arrangement to disguise her pay "wasn't right," but "I worked for [Ritchie], he signed my check; I did it like he told me to."

When Parris Printing began having financial difficulties, the appellant theorized that the "sweep account" at the bank was the problem. Nevertheless, despite the financial problems, Ritchie did not have a problem with paying the appellant her large salary.

The appellant admitted that she made large purchases with her salary. Namely, she had a pool and a hot tub installed at her home, constructed a garage and a sunroom, and had a large amount of concrete poured. She also bought a car. She maintained that Ritchie agreed to pay her more than the owners of the business earned and further stated that she did not feel guilty about her large salary.

-13-

On January 13, 2000, the appellant returned to Parris Printing after receiving a telephone call from Moseley. When the appellant entered the office, Ritchie was with Moseley. He asked the appellant if she was there to find out about "those checks." The appellant testified that she confronted Ritchie because she was "running out of excuses" and was "not feeling good about it anyway." Ritchie informed the appellant that she needed to give him something to show his partners and Kraft. Accordingly, Ritchie told the appellant to write a letter confessing that she took the checks and everything would be resolved. He also told her to give him a check for $42,000 with the understanding that he would not deposit the check. The appellant admitted that she wrote the letter in which she claimed to have appropriated the funds, but at trial she claimed that the contents of the letter were untrue. She contended that she wrote the letter to help Ritchie because "[h]e had been good to me."

On cross-examination, the appellant testified that she was fired on Friday, December 4, 1998. She came back to work on Monday, December 7, 1998, after Ritchie called her because he was "desperate" to have her come back to work. She explained that Ritchie paid her the $20,000 bonus she had requested, but the payment was made in installments. Those payments were reflected in the checks included in count one of the indictment. Additionally, the appellant claimed that Ritchie did not pay her in full, but she kept a running balance of the amount she was owed. Furthermore, the appellant contended that she began billing Parris Printing through Data Solutions in December 1998 despite the fact that no invoices were addressed from Data Solutions until March 1999.

Finally, the appellant called Leona May Walker to testify on her behalf. Walker was a former employee of Parris Printing who was laid off in July 1999. Walker testified that the appellant was fired because Ritchie was angry with the appellant, but she was later rehired "because nobody else could do what she could do." Walker asserted that the appellant was fired on a Tuesday and did not return to work for a week. Walker stated that she would be surprised to learn that the appellant made $300,000 a year because during Walker's year-long employment with Parris Printing, Walker asked for a raise three times and was refused.

Based upon the forgoing, the appellant was found guilty of counts two through six. However, the jury was unable to reach a verdict on count one of the indictment. Thereafter, a sentencing hearing was held.

## B. Sentencing Hearing

At the sentencing hearing, the State submitted the appellant's presentence report. Next, the State called Bart Witsman, an accountant for Vermeer Corporation in Lavergne. Witsman stated that he began working for Vermeer in April 1998 while the appellant was the comptroller for the company. The appellant objected to Witsman testifying regarding any uncharged criminal activity involving the appellant's employment at Vermeer. However, the trial court overruled the appellant's objection because "if there's a showing of prior criminal behavior, I can consider, whether she's charged or not."

Witsman testified:

We found forty-five thousand dollars worth of checks that were – our understanding that they had been deposited in the bank for the IRS for a payroll tax deposits in August of '98. And an IRS agent came and said we were behind on our payroll taxes, at which time, the investigation led that those forty-five thousand dollars worth of checks had been deposited into various accounts under Jamie Waldrum[, the appellant's name prior to her marriage to Lloyd Jones]."

The checks that were supposed to be deposited into Vermeer's payroll tax account had been deposited into one of the appellant's personal accounts. The appellant appropriated these funds during approximately half a year. Moreover, the appellant made a $5,000 loan and a $10,000 loan to Vermeer, using these appropriated funds.

Witsman averred that "[t]he coupons that go along with the payroll tax deposits were filled out just as if they'd been put into the account and satisfied the IRS requirements." Accordingly, without the intervention of the IRS, the missing funds probably would not have been discovered.

Additionally, Witsman testified that "[t]here was about twenty-five thousand dollars worth of checks that were written for made out to cash or made out to [the appellant]. There was a double bonus at the end of '97 that she made out to herself, also, those totalling [sic] about twenty-five thousand." The checks payable to the appellant or to cash were never authorized. The appellant was fired from Vermeer after the discovery of these checks.

The appellant chose not to testify at the sentencing hearing. However, appellant's counsel asked the court to consider a letter and proposed order which had been submitted to Parris Printing's attorney. The proposed order provided that the appellant would sell her house and pay the remaining funds from the sale to Parris Printing as restitution.

The appellant's husband, Lloyd Wallace Jones, Jr., testified on her behalf. He asserted that he had been married to the appellant since October 1998. He stated that he worked as a truck driver earning approximately $47,000 per year. He acknowledged that he and the appellant were selling their house, which had an appraised value of $238,000. The first mortgage on the home was in the amount of $144,000 and there was also a second mortgage for $10,000. Jones asserted that upon the sale of their home, any funds remaining after payment to the lien holders would be used to pay restitution to Parris Printing. Regardless, Jones testified that he believed the appellant when she said that she did not steal any money from Parris Printing.

Jones testified that the appellant bought her son an "'84 or '85 model" car using the funds in her son's savings account. Additionally, Jones observed that the appellant handled all of the family finances and Jones "didn't question anything." Jones maintained that he never asked the appellant how much money she earned while working for Parris Printing, but he knew that she

"made good money." However, Jones admitted that he learned how much money the appellant made when he signed their joint tax return for 1999.

Moreover, Jones conceded that he knew the appellant was being sued by Vermeer. He did not know the particulars of the litigation because the appellant assured him that he did not need to worry. He testified that the appellant bought a Lincoln Town Car and then came home with a Lincoln Navigator. The appellant bought a pool, a fence, an electronic gate, and $2,100 worth of furniture. The appellant also had a patio enclosed and a sunroom built. Jones admitted that in October and November 1999, he bought the appellant $2,400 worth of jewelry. They also owned a $15,000 time share unit at the Sunrise Ridge Resort in Gatlinburg.

Jones asserted that the appellant was remorseful for her actions. He also stated that when he visited her in jail she was upset, cried and wanted out of jail. He said the appellant did not think that she belonged in jail.

On cross-examination, Jones conceded that the appellant owed $100,000 to the IRS because she had failed to pay her taxes. She had not yet made the payment or arranged a payment plan. He stated that he had not met with an IRS agent in order to arrange a payment plan. Additionally, Jones noted that the appellant was willing to repay the almost $42,000 she was convicted of taking, but she had no plans to repay the $300,000 taken from Parris Printing or the money taken from Vermeer.

The appellant's counsel explained to the trial court that the appellant planned to sell her home and any funds remaining after payment of the mortgages were to be paid to Parris Printing, even if the amount exceeded $42,000.

After considering the foregoing facts, the trial court sentenced the appellant to four years incarceration on each offense. The court further found that the appellant was a professional criminal, and ordered the sentences for count two and count six to be served consecutively for a total effective sentence of eight years. The trial court ordered the appellant to serve one year of the sentence in confinement and the remainder on community corrections. The trial court instructed the appellant to make restitution in the amount of $41,460 to Parris Printing while she was serving her community corrections sentence.

The appellant timely appealed, raising the following issues: (1) whether the evidence was sufficient to sustain the convictions; (2) whether the trial court erred in allowing the introduction of evidence presented by Witsman at the sentencing hearing; (3) whether the trial court erred in declaring the appellant to be a professional criminal; (4) whether the trial court erred in finding only one mitigating factor applicable to the appellant; (5) whether the trial court erred in denying the appellant probation; (6) whether the trial court erred in granting the State's oral motion to amend the indictment on the first day of trial; (7) whether the trial court erred in allowing Larry Parris to remain in the courtroom after his testimony when the defense notified the trial court that the defense intended to recall him as a witness, in violation of Tennessee Rule of Evidence 615; (8) whether the

trial court erred in allowing the State to present to the jury, during rebuttal closing arguments, exhibits/evidence not introduced during trial; (9) whether the trial court erred in sentencing the appellant to the maximum sentence of four years on each forgery count; and (10) whether "the trial court err[ed] in refusing to grant the [appellant] a new trial when the defense presented new evidence to the trial court that the State's main witness, [Ritchie] Parris, lied on the witness stand concerning his manner of signature, based on the signature that [he] had provided in his response as a victim in the presentence report of the [appellant]."[6]

## II. Analysis

Initially, we note that the appellant provides no citations to the record within the argument portion of her brief. Accordingly, all of the appellant's issues could be treated as waived by this court. See Tenn. Ct. Crim. App. R. 10(b). However, we will briefly address the appellant's issues.

### A. Amendment of the Indictment

Under both the federal and state constitutions, a criminal accused is entitled "to be informed of the nature and cause of the accusation" against her. U.S. Const. Amend. VI; see also Tenn. Const. Art. I, § 9. This requirement is met when an indictment charging an accused "provides sufficient information (1) to enable the accused to know the accusation to which answer is required, to furnish the court adequate basis for the entry of a proper judgment, and (3) to protect the accused from double jeopardy." State v. Hill, 954 S.W.2d 725, 727 (Tenn. 1997). Such indictment may be amended "in all cases with the consent of the defendant." Tenn. R. Crim. P. 7(b). However, even without the defendant's consent, the trial court may permit an amendment before jeopardy attaches "[i]f no additional or different offense is thereby charged and no substantial rights of the defendant are thereby prejudiced." Id. In a jury trial, jeopardy typically only attaches when the jury is sworn, not during any pretrial procedures. See State v. Pennington, 952 S.W.2d 420, 422 (Tenn. 1997). This court has previously observed that the "denial of a motion to amend an indictment is a matter within the trial court's discretion, and this court will alter the trial court's decision only if that discretion has been abused." State v. Kennedy, 10 S.W.3d 280, 283 (Tenn. Crim. App. 1999).

Prior to empaneling the jury, the appellant moved the court to dismiss count one of the indictment because the indictment reflected that the offense was committed between December 31, 1999, and January 10, 2000, yet none of the proof alleged by the State occurred between these two dates.[7] The State informed the trial court that the appellant had been put on actual notice of the offense dates involved in count one, which dates were December 31, 1998, through January 10, 2000. The appellant admitted that she had actual notice of the offense dates and conceded that an amendment of the indictment would cure any double jeopardy problem. Accordingly, we conclude that the trial court did not abuse its discretion in allowing the State to orally amend the indictment prior to trial to correct the dates involved in count one. See id. at 284. "[T]he record amply reflects

---

[6] We will address these issues in a different order than that in which they were raised.

[7] We note that the appellant was ultimately granted a mistrial on count one due to a deadlocked jury.

-17-

that it was known to all parties that the incorrect date was merely a typographical error.  Jeopardy had not attached, no additional offense was charged, and no substantial rights of [the appellant] were prejudiced."  State v. Darrell Fritts, No. 132, 1992 WL 236152, at \*7 (Tenn. Crim. App. at Knoxville, Sept. 25, 1992).  This issue is without merit.

### B.  Violation of Tennessee Rule of Evidence 615

Tennessee Rule of Evidence 615 is the rule of sequestration and is "now colloquially referred to as 'The Rule.'"  Neil P. Cohen et al., Tennessee Law of Evidence, § 6.15[2] (LEXIS publishing, 4th ed. 2000).  Rule 615 provides:

> At the request of a party the court shall order witnesses, including rebuttal witnesses, excluded at trial or other adjudicatory hearing.  In the court's discretion, the requested sequestration may be effective before voir dire, but in any event shall be effective before opening statements.  The court shall order all persons not to disclose by any means to excluded witnesses any live trial testimony or exhibits created in the courtroom by a witness.  This rule does not authorize exclusion of (1) a party who is a natural person, or (2) a person designated by counsel for a party that is not a natural person, or (3) a person whose presence is shown by a party to be essential to the presentation of the party's cause.  This rule does not forbid testimony of a witness called at the rebuttal stage of a hearing if, in the court's discretion, counsel is genuinely surprised and demonstrates a need for rebuttal testimony from an unsequestered witness.

At the conclusion of Larry Parris' testimony, the appellant asked the trial court for "the Rule."  The State argued that because Larry had concluded his direct testimony and cross-examinations, there was no further need for his sequestration.  The appellant argued that Larry's name was included on her witness list and she might want to recall Larry subsequent to the testimony of Ritchie and Lackey.  The trial court stated, "I understand your position; but just based on the contemplation that you might use [Larry] in the future is not a reason to prevent him from being here."  The appellant contends that "[t]he disallowance to have this rule exacted upon this witness was in direct contradiction to Rule 615, and a violation which tainted the trial of this matter."

We observe that the language of Rule 615 mandates the exclusion of a witness from the courtroom upon the request of a party unless that witness falls within the listed exceptions.  See State v. Anthony, 836 S.W.2d 600, 605 (Tenn. Crim. App. 1992).  The proof does not reveal that Larry met any of the exceptions for sequestration.  Clearly, he was excluded from the courtroom prior to his testimony.  In our view, he should not have been allowed to remain inside the couroom after counsel advised the court that he might be called as a rebuttal witness.  See id.

Regardless, the appellant never recalled Larry to testify, nor did she attempt to show how she was prejudiced by the trial court's failure to exclude him from the courtroom.  Notably, on appeal, the appellant only claims in a conclusory statement that the trial court's error "tainted" the

trial. It is well-established that "[a] defendant may not be granted relief on appellate review when [she] fails to takes action reasonably necessary to prevent or nullify the error." Id.; see also Tenn. R. App. P. 36(a). Moreover, when a sequestration issue is raised on appeal, this court considers the seriousness of the violation and the prejudice endured by the appellant. See State v. Coulter, 67 S.W.3d 3, 52 (Tenn. Crim. App. 2001). In light of the fact that Larry's testimony was consistent with the remainder of the State's proof, we fail to see what prejudice, if any, the appellant suffered. Accordingly, we conclude that the trial court's error was harmless. Tenn. R. Crim. P. 52(a).

## C. Rebuttal

The appellant argues:

During rebuttal closing, the State presented several documents which were not presented during the trial as evidence. The State used these documents, invoices, to attempt to prove to the jury that the Defendant/Appellant had fraudulently prepared documents while in the employ of Parris Printing, and in preparation of a defense against these charges. As such, the State attempted to introduce extraneous information to the jury which was not presented during the proof states of the trial.

As we noted earlier, the appellant has failed to provide any citations to the record to indicate which exhibits she found objectionable. Accordingly, we deem this issue to be waived. Tenn. Ct. Crim. App. R. 10(b). Moreover, we conclude that the appellant also waived this issue by failing to object at trial. Tenn. R. App. P. 36(a); State v. Little, 854 S.W.2d 643, 651 (Tenn. Crim. App. 1992).

## D. Sufficiency of the Evidence

In order to successfully challenge the sufficiency of the evidence supporting her convictions, the appellant must demonstrate to this court that no "rational trier of fact" could have found the essential elements of the crime beyond a reasonable doubt . Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982); Tenn. R. App. P. 13(e). In other words, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). Questions concerning the credibility of the witnesses and the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact and not the appellate courts. State v. Pruett, 788 S.W.2d 559, 561 (Tenn. 1990).

The appellant was convicted of five counts of forgery. The offense of forgery is codified in Tennessee Code Annotated section 39-14-114(a) and (b) (1997):

(a) A person commits an offense who forges a writing with intent to defraud or harm another.
(b) As used in this part, unless the context otherwise requires:
(1) "Forge" means to:

> (A) Alter, make, complete, execute or authenticate any writing so that it purports to:
>
> (i) Be the act of another who did not authorize that act;
>
> . . . .
>
> (C) Issue, transfer, register the transfer of, pass, publish, or otherwise utter a writing that is forged within the meaning of subdivision (1)(A); or
>
> (D) Possess a writing that is forged within the meaning of subdivision (1)(A) with intent to utter it in a manner specified in subdivision (1)(C).

Forgery "is punishable as theft pursuant to [Tennessee Code Annotated section] 39-14-105." Id. at (c).

Larry Parris, Ritchie Parris, Lackey, and Moseley maintained that only Ritchie and Lackey had authority to sign checks for Parris Printing; no employee had such authority. Ritchie, Lackey, Moseley, and Kraft testified that the appellant was originally hired as a full-time bookkeeper for Parris Printing and she was to earn a salary of approximately $40,000 per year. However, according to Ritchie and Moseley, due to the appellant's inability to work the required number of hours, Ritchie hired the appellant as an independent contractor. She was to be paid $20 per hour for the time she worked at Parris Printing and $15 per hour for the work she did at home. Moseley testified that the appellant was the only person who controlled the bank statements for Parris Printing. Additionally, Ritchie and Moseley noted that Moseley and the appellant had the authority to prepare checks, but not to sign them. After several months of financial difficulties with the company, Ritchie and Moseley discovered five suspicious checks. After the appellant was confronted, she wrote a letter of apology for writing those checks to herself and she gave Ritchie a personal check for $42,000.

Larry Parris, Lackey, and Moseley examined the signatures on the checks underlying counts two through six. They each maintained that the signatures on the checks were not Ritchie's signature. Furthermore, Ritchie denied signing the checks or giving anyone else the authorization to sign them. Moreover, the appellant's own expert witness asserted that the signatures on the checks were not Ritchie's signatures. However, because the signatures were attempts to copy Ritchie's signature, the expert was unable to determine any characteristics of the actual writer. Therefore, he could neither exculpate nor inculpate the appellant as the source of the signatures.

The appellant agreed that she was originally hired as a full-time employee. However, she maintained that she was fired because of her absences from work. Shortly after her employment was terminated, Ritchie asked the appellant to return to work. According to the appellant, Ritchie agreed to pay her a $20,000 incentive bonus to return to work. He also agreed to pay the appellant $120 an hour, despite the fact that he had previously paid the appellant only $17 or $18 an hour. The appellant admitted that she prepared the checks underlying counts two through six and conceded that she deposited those checks into her personal account. Regardless, she maintained that she watched Ritchie sign the checks and she asserted that the checks were legitimate payments for her services.

She created "dummy" checks to record in the business records at Ritchie's direction; he did not want anyone to know that she was being paid $300,000 per year. She claimed that she wrote the letter of apology to "help" Ritchie because he had "been good to" her.

The issue ultimately was one of credibility. As we earlier noted, credibility is issue to be determined by trier of fact, not the appellate court. Pruett, 788 S.W.2d at 561. The jury, as was its prerogative, chose to believe Ritchie's testimony that he did not sign the checks nor did he agree to pay the appellant the exorbitant salary she claimed to have earned. Thus, the jury could find that the appellant, who admitted preparing and depositing the checks, forged the writings. This issue is without merit.

### E. Witsman's Testimony

The appellant complains that the trial court erroneously allowed Bart Witsman to testify at her sentencing hearing in contravention of Tennessee Rule of Evidence 608. Initially, we recognize that "[t]he rules of evidence shall apply [at a sentencing hearing], except that reliable hearsay including, but not limited to, certified copies of convictions or documents, may be admitted if the opposing party is accorded a fair opportunity to rebut any hearsay evidence so admitted." Tenn. Code Ann. § 40-35-209(b) (1997). The admission or exclusion of evidence rests in the discretion of the trial court and this court will reverse such a ruling only if the trial court abused that discretion. State v. West, 737 S.W.2d 790, 793-94 (Tenn. Crim App. 1987).

> Tennessee Rule of Evidence 608(b) provides:
> Specific instances of conduct of a witness for the purpose of attacking or supporting the witness's credibility, other than convictions of a crime as provided in Rule 609, may not be proved by extrinsic evidence. They may, however, if probative of truthfulness or untruthfulness . . . , be inquired into on cross-examination.

In the instant case, Witsman's testimony was not presented at the sentencing hearing as an attack on the appellant's credibility. Instead, the State called Witsman to demonstrate the appellant's prior criminal activity.

Over the appellant's objection, the trial court allowed Witsman to testify, correctly ruling that "if there's a showing of prior criminal behavior, I can consider, whether she's charged or not." In State v. Carico, 968 S.W.2d 280, 287 (Tenn. 1998), our supreme court stated that "the trial court may utilize criminal behavior shown by a preponderance of the evidence to enhance a sentence without violating federal or state due process." See also State v. Winfield, 23 S.W.3d 279, 283 (Tenn. 2000). As noted, the State called Witsman to attempt to establish, by a preponderance of the evidence, that the appellant had been previously involved in criminal activity. We conclude that the trial court did not abuse its discretion in allowing Witsman to testify at the sentencing hearing.

### F. Sentencing

Appellate review of the length, range or manner of service of a sentence is de novo. Tenn. Code Ann. § 40-35-401(d) (1997). In conducting its de novo review, this court considers the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statement by the appellant in her own behalf; and (7) the potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-102 and -103 (1997), -210 (Supp. 2002); see also State v. Ashby, 823 S.W.2d 166, 168 (Tenn. 1991). The burden is on the appellant to demonstrate the impropriety of her sentence(s). Tenn. Code Ann. § 40-35-401, Sentencing Commission Comments. Moreover, because the record reveals that the trial court adequately considered sentencing principles and all relevant facts and circumstances, this court will accord the trial court's determinations a presumption of correctness. Id. at (d); Ashby, 823 S.W.2d at 169.

1. Length of Sentence

The appellant raises two issues regarding the length of her sentence. First, she contends that the trial court erred in applying only one mitigating factor when determining the length of her sentence. Second, she complains that the trial court erred in sentencing her to the maximum sentence of four years on each offense. As these issues are interlocking, we will address them simultaneously.

The appellant was convicted of five counts of forgery more than $1,000 but less than $10,000. The forgery statute provides that forgery "is punishable as theft pursuant to [Tennessee Code Annotated section] 39-14- 105." Tenn. Code Ann. § 39-14-114(c). Tennessee Code Annotated section 39-14-105(3) (1997) classifies theft of more than $1,000 but less than $10,000 as a Class D felony. Additionally, the appellant was sentenced as a standard Range I offender.

"The presumptive sentence for a Class . . . D . . . felony shall be the minimum sentence in the range if there are no enhancement or mitigating factors." Tenn. Code Ann. § 40-35-210(c). Therefore, the presumptive sentence for each of the appellant's convictions is two years, the minimum sentence for a Class D felony committed by a Range I offender. However, if there are enhancement but no mitigating factors, then the sentence may be set above the minimum in that range but still within the range. Id. at (d). If there are both enhancement and mitigating factors, a court should begin at the presumptive sentence and enhance for the enhancement factors then reduce as appropriate for the mitigating factors. Id. at (e).

As we earlier noted, the State submitted into evidence the appellant's presentence report and produced the testimony of Witsman at the sentencing hearing. Witsman testified regarding the appellant's previous appropriation of funds while she worked for Vermeer. The appellant's husband, Lloyd Jones, testified on her behalf.

At the conclusion of the hearing, the trial court determined that the only mitigating factor applicable was that the appellant's "criminal conduct neither caused nor threatened serious

bodily injury." Tenn. Code Ann. § 40-35-113(1) (1997). However, the trial court afforded this factor little weight because it would be found in "most every theft related" crime.

The other mitigating factors which were proposed by the appellant at the sentencing hearing were:[8]

> (3) Substantial grounds exist tending to excuse or justify the [appellant's] criminal conduct, though failing to establish a defense;
> (7) The [appellant] was motivated by a desire to provide necessities for [her] family or [herself];
> (12) The [appellant] acted under duress or under the domination of another person, even though the duress or the domination of another person is not sufficient to constitute a defense to the crime; [and]
> (13) The [appellant] is attempting to make restitution for the $42,000.00 under the Forgery convictions, Counts Two through Six, by the sale of her house.

Tenn. Code Ann. § 40-35-113(3), (7), (12), and (13). In examining these factors, the trial court stated that "they just don't mesh with the [appellant's] position, now or at trial." The trial court determined that there were no grounds to "excuse or justify" the appellant's criminal behavior. Additionally, in light of the appellant's lavish spending, the trial court found that the appellant was not acting under a desire to provide necessities for herself or her family. The trial court further observed that there was no proof in the record that the appellant acted under duress or domination.

> Moreover, in connection with the appellant's restitution, the trial court observed:
> In terms of restitution, and that being submitted as a mitigating factor, I just think she's caught in the position where Parris apparently is not going to lay down like Vermeer did and get money back from their insurance, and then jus[t] say, well, the rest of it isn't worth [it]. . . .
>
> So I don't think it's something she's volunteering to provide to Parris Printing, but for their efforts to make her do it, because her position, all along, has been that she deserved this money.

Based upon the trial court's reasoning, we conclude that the trial court did not err in refusing to apply these mitigating factors.

The trial court found the presence of two enhancement factors: (6) the amount of damage to property sustained by or taken from the victim was particularly great and (15) the appellant abused a position of public or private trust, or used a special skill in a manner that

---

[8] This court must assume that these are the mitigating factors the appellant complains the trial court failed to apply. The appellant did not specifically set out the applicable mitigating factors in her brief.

significantly facilitated the commission or fulfillment of the offense.  Tenn. Code Ann. § 40-35-114(6) and (15) (1997).[9]  The trial court afforded these factors great weight.

We note that, generally, "since the punishment for theft is enhanced based upon the amount taken by the accused, use of this enhancement factor constitutes double enhancement in violation of the statute."  State v. Grissom, 956 S.W.2d 514, 518 (Tenn. Crim. App. 1997). However, this court has also noted that when the amount taken approaches the upper end of the offense spectrum or the amount taken is as much as six times the amount of the minimum of the offense, then the application of enhancement factor (6) is proper.  See Grissom, 956 S.W.2d at 518 n.4; State v. Cynthia Taylor Mann, No. M1999-01390-CCA-R3-CD, 2001 WL 487686, at *4 (Tenn. Crim. App. at Nashville, May 8, 2001); State v. Barbara D. Frank, No. 03C01-9209-CR-00303, 1993 WL 539401, at *4 (Tenn. Crim. App. at Knoxville, Dec. 22, 1993).  In the instant case, the trial court observed that "each count of this indictment that she's now been convicted on obviously are well above the minimum amount for that particular finding; that is, above one thousand dollars.  And the cases allow the Court to consider that fact when you get up near and around the maximum amount within that range."  Accordingly, we agree with the trial court's application of this factor and concluded that the trial court did not err in according it great weight.

The trial court also found that the appellant had abused a position of trust.  See Tenn. Code Ann. § 40-35-114(15).  The appellant had the authority to prepare the checks for the business. In exercising this ability, she forged several checks to herself.  Additionally, she ensured that she was in sole control of the bank statements for the company in order to disguise her appropriation of funds.  Moreover, even though she knew Ritchie was concerned about the company having insufficient funds to cover the company payroll, she nevertheless blamed the bank for the financial difficulties.  We conclude that because the appellant "was an employee of the victim company, a position of trust which enabled her to commit these crimes," the trial court properly applied this enhancement factor.  Grissom, 956 S.W.2d at 518.

The appellant complains that the trial court "improperly sentenced the [appellant] . . . when it failed to start at the minimum, then enhance upward, then downward as prescribed." However,

> [t]he appellant's sentence is not determined by the mathematical process of adding the sum total of enhancing factors present then subtracting from this figure the mitigating factors present for a net number of years. Rather, the weight to be afforded an existing factor is left to the trial court's discretion so long as the court complies with the purposes and principles of the 1989 Sentencing Act and its findings are adequately supported by the record.

---

[9] As of July 4, 2002, the statutory enhancement factors have been renumbered.  Tenn. Code Ann. § 40-35-114 (Supp. 2002).  However, in the instant case, we will use the numbering of the 1997 version of Tennessee Code Annotated section 40-35-114.

State v. Boggs, 932 S.W.2d 467, 475-476 (Tenn. Crim. App. 1996). We find no error in the appellant's sentence of four years for each offense.

## 2. Consecutive Sentencing

The trial court then examined the evidence found and determined that consecutive sentencing was appropriate, determining that the appellant was a professional criminal. The trial court then ordered the sentence for count six to be served consecutively to count two with the remaining sentences to run concurrently. The appellant appeals this ruling. Initially, we note that "[w]hether sentences are to be served concurrently or consecutively is a matter addressed to the sound discretion of the trial court." State v. Adams, 973 S.W.2d 224, 230-31 (Tenn. Crim. App. 1997).

Tennessee Code Annotated section 40-35-115(b) (1997) contains the discretionary criteria for imposing consecutive sentencing. See also State v. Wilkerson, 905 S.W.2d 933, 936 (Tenn. 1995). The trial court imposed consecutive sentencing on the basis that "[t]he [appellant] is a professional criminal who has knowingly devoted such [appellant's] life to criminal acts as a major source of livelihood." This classification derived from Gray v. State, 538 S.W.2d 391, 393 (Tenn. 1976). See Tenn. Code Ann. § 40-35-115, Sentencing Commission Comments. Gray defined a professional criminal as "one who has knowingly devoted [her]self to criminal acts as a major source of livelihood or who has substantial income or resources not shown to be derived from a source other than criminal activity." Id.

The trial court stated that "I do think there is a sufficient showing that [the appellant], because of her lifestyle and her major source of livelihood, being through criminal activity, either through Vermeer or Parris Printing, is a professional criminal." The facts support this assertion. Over approximately two years, the appellant engaged in a pattern of bilking her employers out of valuable funds. See State v. Rhoden, 739 S.W.2d 6, 18 (Tenn. Crim. App. 1987). She applied these funds to lavish purchases and stopped only when discovery of her deeds was imminent. Moreover, this court has previously stated that "[o]ne who derives '*a* major source of livelihood' from criminal activity may also receive substantial livelihood in a legitimate business. The operation of a legitimate business will not insulate a professional criminal . . . from consecutive sentencing." State v. Walker, 713 S.W.2d 332, 334 (Tenn. Crim. App. 1986) (emphasis in original). The trial court did not err in its ruling.

## 3. Probation

In the appellant's statement of the issues raised on appeal, she contends that the trial court erred in denying probation. However, this issue was never addressed in her brief. "Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court." Tenn. Ct. Crim. App. R. 10(b).

## G. Motion for New Trial

As her final issue, the appellant contends that the trial court erred by refusing to grant a new trial based on new evidence presented at the sentencing hearing. The "new evidence" the

appellant presented was Ritchie's signature on his victim impact statement which was included as part of the appellant's presentence report. The appellant alleged that the signature demonstrated that the "descenders . . . on the end of the J's squirrel back to the right," contrary to Ritchie's trial testimony. "Based on the assertion that [Ritchie's] testimony was contradictory to his own signature, and that his signature was the basis for all of the convictions [the appellant] received in this case, the [appellant] requested a new trial."

This court has previously observed that the decision to "grant[ ] or den[y] a new trial on the basis of newly discovered evidence rests within the sound discretion of the trial judge." State v. Caldwell, 977 S.W.2d 110, 117 (Tenn. Crim. App. 1997). Accordingly, we will not overturn the trial court's decision absent an abuse of discretion. See State v. Meade, 942 S.W.2d 561, 565 (Tenn. Crim. App. 1996). It is the law of this state that

> a trial court should grant a defendant a new trial on the basis of newly discovered evidence when [(1)] the defendant has been reasonably diligent in obtaining evidence, [(2)] the materiality of the new evidence is apparent, and [(3)] the evidence is likely to change the result [of the trial]. It is true that newly discovered impeachment evidence will not constitute grounds for a new trial, as a general rule. But if the impeaching evidence is so crucial to the defendant's guilt or innocence that its admission will probably result in an acquittal, a new trial may be ordered.

State v. Singleton, 853 S.W.2d 490, 496 (Tenn. 1993) (citations omitted). This court has also observed that a new trial will not be granted on the basis of newly discovered evidence when such evidence will serve only to impeach a witness. See State v. Arnold, 719 S.W.2d 543, 550 (Tenn. Crim. App. 1986). Additionally, "[w]here evidence tends only to contradict or impeach the trial evidence, a new trial based on such alleged newly discovered evidence is not warranted." State v. LeQuire, 634 S.W.2d 608, 615 (Tenn. Crim. App. 1981). All three prongs of the aforementioned test must be met before an appellant is entitled to a new trial based on newly discovered evidence. See State v. Nichols, 877 S.W.2d 722, 737 (Tenn. 1994).

> The trial court ruled:
> In terms of the new evidence, which I don't think there's a basis for saying this is new evidence–I mean, the defendant's own expert took knowing exemplar samples from [Ritchie], along with the defendant's, and made his analysis of that. So the fact that – I mean, we can make it an exhibit, but the fact that there may be some quirk in your opinion in terms of what – how his signature was exhibited on the victim impact statement, I don't think under the case law rises to the level of being new evidence, sufficient for me to grant new trial.

We agree with the trial court. In light of the overwhelming evidence at trial that the signatures on the checks underlying counts two through six were not Ritchie's, we conclude that this "new evidence" is not likely to change the result of the trial. This issue is without merit.

## III. Conclusion
Finding no reversible error, we affirm the judgments of the trial court.


                                  _____

NORMA McGEE OGLE, JUDGE